1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
9                  AT SEATTLE

10   STATE OF WASHINGTON,                    CASE NO. C14-1451JLR

11                      Plaintiff,           ORDER DENYING MOTION
                                             FOR A STAY
12            v.

13   INTERNET ORDER, LLC, et al.,

14                      Defendants.

15                      I.      INTRODUCTION

16      Before the court is Defendants Internet Order, LLC, and Daniel Roitman's

17   (collectively "Internet Order" or "Defendants") motion for a stay or, in the alternative, to

18   establish a coordinated case schedule with a related case.  (Mot. (Dkt. # 18).)  Plaintiff

19   State of Washington ("the State") opposes Internet Order's motion.  (Resp. (Dkt. # 20).)

20   Relevant to the present motion is a civil action pending in the First Judicial District of

21   Pennsylvania.  *See Commonwealth of Pa. v. Internet Order, LLC, et al.*, Case No.

22

ORDER- 1

1   140902866 (Ct. of Common Pleas of Phila. Cnty. 2014) ("the Pennsylvania Action").

2   Internet Order asks the court to stay proceedings until final resolution of the Pennsylvania

3   Action or, in the alternative, to establish a case schedule in coordination with that case.

4   (Mot. at 1.)  The court has considered the motion, the parties' submissions filed in

5   support of and opposition thereto, the balance of the record, and the applicable law.

6   Considering itself fully advised, the court DENIES Internet Order's motion.

7                   **II.      BACKGROUND**

8           Internet Order markets and sells language learning audio products through its

9   website, www.pimsleurapproach.com.  (*Id*. at 2.)  The company employs approximately

10  120 people and has no offices outside of Pennsylvania.  (*Id*. at 3.)  Defendant Daniel

11  Roitman is the founder, co-owner, and Chief Executive Officer ("CEO") of Internet

12  Order.  (Am. Compl. (Dkt. # 6) ¶ 3.3.)  The State alleges that more than 38,000

13  Washington consumers have purchased products from Internet Order, and its gross

14  national revenue in 2013 was close to $80 million.  (Am. Compl. ¶ 1.2; Resp. at 3.)

15          Internet Order advertises a "Quick and Simple Course" priced at $9.95.  (Mot. at

16  2.)  The State alleges that, when signing up for this offer, customers are automatically

17  enrolled in a negative option plan called the Pimsleur Rapid Fluency Program.  (Am.

18  Compl. ¶ 1.1.)  According to the State, this program consists of four levels ("Gold Levels

19  1-4") that cost $256.00 each.  (*Id*.)  Internet Order sends Gold Level 1 to a customer 20

20  days after the customer's purchase of the Quick and Simple Course.  (*Id*. ¶ 4.2.)  The

21  customer then has 30 days to return the Gold Level 1 program.  (Mot. at 2.)  If the

22  customer does not return the program, Internet Order charges four monthly payments of

ORDER- 2

1  $64.00 to the customer's credit card.  (Am. Compl. ¶ 4.3.)  Internet Order sends the next

2  Gold Level program to the customer, with the same payment terms, sixty days after the

3  first.  (*Id.* ¶ 4.1.)  The customer's obligation may rise as high as $1,024.00 after Internet

4  Order sends four Gold Level programs to the customer.  (*Id.* ¶ 1.1.)

5      The State further alleges that if the customer attempts to return the product and

6  cancel the charges, Internet Order subjects the customer to various "save" techniques and

7  forces the customer to pay a 25% restocking fee and shipping costs.  (*Id.* ¶ 1.2.)  Such

8  "save" techniques include representing that the next advanced course is ready to be

9  shipped and would be difficult to stop, as well as claiming that Internet Order has already

10  paid "royalties" on the product and is thus incapable of issuing a refund.  (*Id.* ¶ 10.2(e).)

11  According to the State, Internet Order also requires the customer to acquire a Return

12  Merchandise Authorization Number ("RMA Number") in order to return a shipment.  (*Id.*

13  ¶ 10.2(b).)  If the customer fails to do so, Internet Order rejects the customer's return.

14  (*Id.*)  If the customer returns the product after the 30 days, but before all four of the

15  monthly payments have been made, Internet Order still charges for the remaining

16  monthly payments up to $256.00.  (*Id.* ¶ 4.3.)  The State alleges that, if the customer

17  simply refuses to make monthly payments, Internet Order sends "threatening collection

18  letters" warning that it will send the delinquent accounts to a collection agency, though it

19  has no intention of doing so.  (*Id.* ¶ 1.2.)

20      The State alleges that Internet Order presents the customer with an "official

21  receipt" on the summary page when the customer concludes ordering the Quick and

22  Simple Course.  (*Id.* ¶ 4.23.)  The only charges Internet Order lists on the receipt are the

ORDER- 3

1  $9.95 initial cost and shipping costs.  (*Id.*)  Additionally, the confirmation email received

2  by the customer lists only the $9.95 price.  (*Id.* ¶ 4.25.)  When the Gold Level package

3  arrives, it includes what appears to be an invoice that lists the order total as $0.00.  (*Id.*

4  ¶ 4.27.)  The State alleges that there is no mention on the summary page, the

5  confirmation email, or the Gold Level invoice of the $256.00 charge that will be imposed

6  if the product is not returned within 30 days.  (*See id.* ¶¶ 4.23, 4.25, 4.27.)

7       The State further alleges that Internet Order has used and continues to use

8  deceptive tactics to prevent customers from noticing their negative option commitment.

9  (*Id.* ¶ 4.6.)  From May 2008 to May 2010, Internet Order used a pre-checked box on the

10  Quick and Simple Course order form.  (*Id.* ¶ 4.7.)  The box was shaded a light gray and,

11  if left checked, would sign the customer up for the Pimsleur Rapid Fluency Program.  (*Id.*

12  ¶ 4.9.)  In 2010, Internet Order removed the pre-checked box and began to automatically

13  sign up all customers who purchased the Quick and Simple Course.  (*Id.* ¶ 4.13.)  The

14  State alleges that in order to find the additional terms relating to the Rapid Fluency

15  Program the customer must go through a multi-step process by following inconspicuous

16  links on a variety of different pages.  (*Id.* ¶¶ 4.18-4.22.)

17       From 2012 to 2013, the Attorneys General in New York, Pennsylvania, and

18  Washington commenced investigations into Internet Order's online marketing and sales.

19  (Mot. at 2.)  The State of Washington filed this action on September 22, 2014.  (*See*

20  Compl. (Dkt. # 1).)  The State of Washington asserts eight claims:  seven violations of

21  the Washington Consumer Protection Act ("CPA"), RCW ch. 19.86, and one violation of

22  the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403.  (Am.

ORDER- 4

1    Compl. ¶¶ 5.1-12.3.)  The fifth cause of action is a violation of the Unsolicited Goods Act

2    ("UGA"), RCW 19.56.20, but the State notes that this particular violation of the UGA

3    also constitutes a violation of the CPA.  (Am. Compl. ¶¶ 8.1-8.5.)  The State brings each

4    of these claims on behalf of Washington residents.  (*See id*. ¶¶ 3.1, 5.4.)

5          ROSCA makes it "unlawful for any person to charge or attempt to charge any

6    consumer for any goods or services sold in a transaction effected on the Internet through

7    a negative option feature," unless the person or company meets certain requirements.  15

8    U.S.C. § 8403.  The requirements are as follows:  "[T]he person (1) provides text that

9    clearly and conspicuously discloses all material terms of the transaction before obtaining

10   the consumer's billing information; (2) obtains a consumer's express informed consent

11   before charging the consumer's credit card, debit card, bank account, or other financial

12   account for products or services through such transaction; and (3) provides simple

13   mechanisms for a consumer to stop recurring charges from being placed on the

14   consumer's credit card, debit card, bank account, or other financial account."  15 U.S.C.

15   § 8403(1)-(3).

16         The bases for the State's causes of action under the CPA are:  (1) failure to

17   disclose material terms of the offer (Am. Compl. ¶¶ 6.1-6.3); (2) misrepresentations (*id*.

18   ¶¶ 7.1-7.3); (3) a statutory violation of the UGA (*id*. ¶¶ 8.1-8.6); (4) imposing an

19   unlawful penalty (*id*. ¶¶ 9.1-9.4); (5) unfair and deceptive cancellation practices (*id*.

20   ¶¶ 10.1-10.3); (6) unfair and deceptive representation of a trial period (*id*. ¶¶ 11.1-11.4);

21   and (7) unfair and deceptive collection practices (*id*. ¶¶ 12.1-12.3).

22

ORDER- 5

1    In its complaint, the State requests that the court grant the following relief:  (1) a

2  permanent injunction against Defendants from continuing or engaging in the unlawful

3  conduct complained of; (2) civil penalties, pursuant to RCW 19.86.140, against

4  Defendants for each and every violation of the CPA caused by the conduct complained

5  of; (3) restitution to consumers of money or property acquired by Defendants as a result

6  of the conduct complained of; and (4) the attorneys' fees and costs of bringing this action,

7  as well as such other and additional relief as the court may determine to be just and

8  proper.  (Am. Compl. ¶ 14.1(e)-(h).)

9    The Pennsylvania Action was filed on the same date as this suit.  (*See* Hibberd

10  Decl. (Dkt. # 19) Ex. A ("Pa. Compl.").)  The Attorney General of Pennsylvania alleges

11  seven violations of the Pennsylvania Consumer Protection Law ("CPL"), 73 P.S. § 201,

12  including:  (1) Defendants misrepresented and failed to clearly and conspicuously

13  disclose the terms and conditions of purchase (Pa. Compl. ¶¶ 60-79); (2) Defendants

14  misrepresented and failed to clearly and conspicuously disclose the terms and conditions

15  of purchase through correspondence with consumers and/or order confirmations (*id.*

16  ¶¶ 82-94); (3) Defendants misrepresented and failed to clearly and conspicuously disclose

17  the terms and conditions of purchase in Defendants' invoices (*id.* ¶¶ 97-108); (4)

18  Defendants misrepresented the urgency of the program offer (*id.* ¶¶ 111-118); (5)

19  Defendants misrepresented that the offer was risk free when it was not (*id.* ¶¶ 121-129);

20  (6) Defendants failed to have an effective, simple, and straightforward means for

21  consumers to cancel (*id.* ¶¶ 132-142); and (7) Defendants failed to register the names

22

ORDER- 6

1  "Pimsleur Approach" and "Pimsleurapprach.com" with the Pennsylvania Corporations

2  Bureau (*id*. ¶¶ 145-152).

3      The Commonwealth of Pennsylvania is requesting the following relief:  (1) a

4  permanent injunction as to Defendants and anyone acting on their behalf, from violating

5  the CPL and any amendments as to all of the various methods, acts, and practices

6  described in the seven CPL claims; (2) payment of civil penalties for each instance of an

7  alleged violation of the CPL; (3) payment of full restitution to all consumers who have

8  suffered alleged losses as a result of acts or practices alleged in the Complaint or which

9  violate the CPL; (4) an order directing Defendants to disgorge and forfeit all profits they

10  have derived as a result of allegedly unfair and deceptive acts and practices; and (5) an

11  award of the Pennsylvania Attorney General's investigative and litigation attorneys' fees

12  and costs.  (*Id*. at 15-17, 19-22, 24-26, 28-30, 32-34, 36-38, 40-42.)

13                              **III.    ANALYSIS**

14      A district court has the discretionary power to stay its proceedings.  *Lockyer v.*

15  *Mirant Corp.*, 398 F.3d 1098, 1109 (9th Cir. 2005).  This power to stay is "incidental to

16  the power inherent in every court to control the disposition of the causes on its docket

17  with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N.*

18  *Am. Co.*, 299 U.S. 248, 254 (1936); *see also Dependable Highway Exp., Inc. v.*

19  *Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) ("A trial court may . . . find it is

20  efficient for its own docket and the fairest course for the parties to enter a stay of an

21  action before it, pending resolution of independent proceedings which bear upon the

22

1    case."). This is best accomplished by the court's "exercise of judgment, which must

2    weigh competing interests and maintain an even balance." *Landis*, 299 U.S. at 254-55.

3         When considering a motion to stay, the court weighs a series of competing

4    interests:  (1) the possible damage that may result from the granting of the stay; (2) the

5    hardship or inequity which a party may suffer in being required to go forward; and (3) the

6    orderly course of justice measured in terms of the simplifying or complicating of issues,

7    proof, and questions of law which could be expected to result from a stay.  *CMAX, Inc. v.*

8    *Hall*, 300 F.2d 265, 268 (9th Cir. 1962) (citing *Landis*, 299 U.S. at 254-55); *see also*

9    *Lockyer*, 398 F.3d at 1109.  As the Ninth Circuit has noted, "*Landis* cautions that 'if there

10   is even a fair possibility that the stay . . . will work damage to some one else,' the party

11   seeking the stay 'must make out a clear case of hardship or inequity.'"  *Lockyer*, 398 F.3d

12   at 1112 (quoting *Landis*, 299 U.S. at 255).

13   **A.  Possible Damage from Granting the Stay**

14        The first factor the court considers is the possible damage that may result from the

15   granting of the stay.  *CMAX, Inc.*, 300 F.2d at 268.  In support of its motion, Internet

16   Order claims that no damage would result from a stay because the claims in this action

17   are subsumed within the claims asserted in the Pennsylvania Action.  (Mot. at 6.)

18   Additionally, Internet Order argues that the relief requested in each action is nearly

19   identical.  (*Id*.)  Internet Order argues that, because the Pennsylvania claims are

20   nationwide in scope, if it were found liable for the claims in that case, almost all of the

21

22

ORDER- 8

1  relief sought in the present case would be redundant.[1]  (*Id.*)  Thus, neither the

2  Washington Attorney General nor Washington consumers would be subject to harm from

3  the imposition of a stay.  (*Id.*)

4        In opposition to the motion, the State argues that Washington consumers will be

5  harmed by a stay because a claim under ROSCA is not at issue in the Pennsylvania

6  Action.  (Resp. at 5-6.)  As the State notes, the statutory prohibitions contained in

7  ROSCA, unlike the CPL, are specifically applicable to the alleged conduct here.  In the

8  Pennsylvania lawsuit, the Commonwealth must prove that Internet Order's alleged

9  practices are "unfair or deceptive" under Pennsylvania case law.  However, ROSCA

10  specifically provides that:

11        It shall be unlawful for any person to charge or attempt to charge any
         consumer for any goods or services sold in a transaction effected on the
12        Internet through a negative option feature (as defined in the Federal Trade
         Commission's Telemarketing Sales Rule in part 310 of title 16, Code of
13        Federal Regulations), unless the person--

14        (1) provides text that clearly and conspicuously discloses all material terms
            of the transaction before obtaining the consumer's billing information;
15

16        (2) obtains a consumer's express informed consent before charging the
            consumer's credit card, debit card, bank account, or other financial
            account for products or services through such transaction; and
17

18        (3) provides simple mechanisms for a consumer to stop recurring charges
            from being placed on the consumer's credit card, debit card, bank
            account, or other financial account.

19

20

21       [1] Internet Order acknowledges that the award of attorneys' fees and costs to the State in
   this action would not be covered in the Pennsylvania Action, but contends that this could be
22  resolved in a summary proceeding after the Pennsylvania Action has completed.  (Mot. at 6.)

ORDER- 9

1  15 U.S.C. § 8403.  Unlike ROSCA, the CPL does not specifically require "express

2  informed consent" to a negative option sale.  *Compare* 15 U.S.C. § 8403(2) *with* 73 P.S.

3  § 201.  Neither does the CPL expressly require "simple mechanisms for a consumer to

4  stop recurring charges" in a negative option context.  *Compare* 15 U.S.C. § 8403(3) *with*

5  73 P.S. § 201.  Nor does the CPL expressly require "clear and conspicuous disclosure" of

6  all material terms "before obtaining the consumer's billing information" in a negative

7  option sale.  *Compare* 15 U.S.C. § 8403(1) *with* 73 P.S. § 201.

8      Despite the existence of numerous consumer protection laws in various states,

9  Congress enacted ROSCA to specifically regulate the type of negative-option selling

10  alleged here and authorized state attorneys general to "bring an action on behalf of the

11  [state's] residents . . . to obtain appropriate injunctive relief."  15 U.S.C. § 8405(a).  If the

12  court were to grant a stay, the entitlement of this State's residence to the protection

13  granted by Congress under ROSCA would be thwarted.  This is the type of harm that

14  militates against granting a stay.  *See, e.g.*, *Lockyer*, 398 F.3d at 1112 (concluding that,

15  where the "Attorney General seeks injunctive relief against ongoing and future harm[,]"

16  as opposed to mere damages for past harm, "there is more than just a 'fair possibility' of

17  harm to the Attorney General, and to the interests of [state consumers] whose interest he

18  seeks to protect").

19      The court finds that the specific requirements and injunctive relief provided by

20  ROSCA are distinct from the requirements and relief available under the CPL.  Even if

21  the allegations in the Pennsylvania complaint are ultimately proven and determined to be

22  a violation of the CPL, there is no guarantee that the injunctive relief awarded under the

ORDER- 10

1  CPL will match the relief that can be provided under ROSCA.  As discussed above,

2  unlike the CPL, ROSCA is designed to protect consumers by enjoining violations of its

3  specifically-enumerated requirements.  Thus, the court concludes that a stay would

4  potentially harm Washington consumers because it would delay their ability to obtain

5  relief under ROSCA if such relief is warranted.

6        Finally, the court is unconvinced by Internet Order's argument that the

7  Pennsylvania Action has nationwide applicability.  Although the parties do not discuss

8  the issue, case law indicates that the CPL has no effect beyond the boundaries of

9  Pennsylvania.  Pennsylvania courts have repeatedly held that the CPL does not have

10  extraterritorial effect.  *See Levy v. Keystone Food Products*, Nos. 07-5502, 08-1277, 08-

11  1554, 2008 WL 4115856, at *6 (E.D. Pa. Aug. 28, 2008) ("State consumer protection

12  laws are designed to protect the residents of the state in which the statutes are

13  promulgated.") (internal quotations omitted); *Baker v. Family Credit Counseling Corp.*,

14  440 F. Supp. 2d 392, 414 (E.D. Pa. 2006) ("[F]ederal courts . . . have refused to apply the

15  [CPL] to non-residents of Pennsylvania[.]"); *Rios v. Cabrera*, No. 3:10–CV–636, 2010

16  WL 5111411, at *3 (M.D. Pa. Dec. 9, 2010) (stating, in reference to the CPL:  "The long-

17  standing rule is that 'laws have no force of themselves beyond the jurisdiction of the state

18  which enacts them, and can have extraterritorial effect only by the comity of other

19  states.'") (internal citation omitted).  Thus, even if the Commonwealth were to prevail, it

20  does not appear that an order from the Pennsylvania court under the CPL would have any

21  effect with respect to Internet Order's conduct in Washington State.  Based on the

22  foregoing, the court concludes that the first factor weighs against granting a stay.

**B. Hardship or Inequity from Withholding the Stay**

The second factor the court considers is the hardship or inequity which a party may suffer in being required to go forward.  *CMAX, Inc.*, 300 F.2d at 268.  Internet Order argues that it will be subject to significant legal costs and logistical burdens if the court denies the motion to stay.  (Mot. at 7-8.)  Internet Order claims that the expense of obtaining legal counsel in two different states, being subject to discovery in two actions, travel costs, the expense of two potentially lengthy trials, and the prospect of liability for attorneys' fees and costs incurred in both states, presents an unreasonable hardship.  (*Id.* at 7.)  Internet Order also contends that it would be forced to use its finite resources and limited workforce of approximately 120 employees to assist in both lawsuits.  (*Id.*; *see also* Hibberd Decl. (Dkt. # 19) ¶¶ 4, 7.)  Internet Order asserts that this demand on its workforce would pose a significant logistical burden for its business.  (Mot. at 7; *see also* Hibberd Decl. ¶¶ 3-4, 7.)

The party seeking the stay "must make out a clear case of hardship or inequity" if there is a "fair possibility that the stay . . . will work damage to some one else."  *Lockyer*, 398 F.3d at 1112 (quoting *Landis*, 299 U.S. at 255).  In its analysis of Factor 1, the court concluded that a stay would potentially harm Washington consumers.  Thus, Internet Order must establish "a clear case of hardship or inequity."  *Id*.  As the State points out, "being required to defend a suit, without more, does not constitute a 'clear case of

ORDER- 12

1 hardship or inequity.'" (Resp. at 7); *Lockyer*, 398 F.3d at 1112.[2]  Internet Order claims

2 that *Lockyer* is distinguishable because the related action was unlikely to provide any

3 legal resolution to the *Lockyer* case, so there were no potential cost savings to staying the

4 litigation.  (Reply (Dkt. # 21) at 4.)  As was noted in the court's analysis of Factor 1, the

5 ROSCA claim will have to be litigated in Washington regardless of the outcome of the

6 Pennsylvania Action, and courts have held that the CPL does not have extraterritorial

7 effect.  *See supra* § III.A.  Thus, the court cannot conclude that the Pennsylvania Action

8 will provide legal resolution to the current case.

9         Internet Order also claims that denying the motion to stay would create a

10 substantial risk of inconsistent and conflicting results.  (Mot. at 8.)  Internet Order argues

11 that the Pennsylvania Action should proceed first because the claims in that action are

12 broader than the claims in the Washington action.  (*Id.*)  Though the possibility of

13 conflicting judgments is a valid consideration,[3] the court is not convinced it is an issue

14 here.  As discussed above, case authority supports the conclusion that the CPL does not

15 have extraterritorial effect.  *See Levy*, 2008 WL 4115856, at *6; *Baker*, 440 F. Supp. 2d at

16 414; *Rios*, 2010 WL 5111411, at *3.  Thus, any order issued by the court in Pennsylvania

17

18      [2] S*ee also Dependable Highway Exp., Inc.*, 498 F.3d at 1066 (finding that defending a
suit does not constitute a clear case of hardship or inequity); *Lively v. Caribbean Cruise Line,
Inc*, No. 2:14–cv–00953 JAM CKD, 2014 WL 4377924, at *5 (E.D. Cal. Sept. 4, 2014) (using
19 the *Lockyer* rationale despite the defendant's claim "that the simultaneous prosecution of these
various actions in separate courts . . . subjects the defendants . . . to a duplicative burden and
20 expense of discovery.") (internal quotations omitted).

21      [3] *See United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Industry,
Steamfitters & Refrigerator Union, Local 342, AFL-CIO v. Valley Engineers*, 975 F.2d 611, 615
22 (9th Cir. 1992) (recognizing the importance of avoiding conflicting or redundant judgments).

1   is unlikely to be directly applicable to Internet Order's conduct here.  Further, contrary to

2   Internet Order's assertion, it is the ROSCA claim in this action that has potentially

3   broader application than the claims under the CPL in Pennsylvania.  Thus, following

4   Internet Order's logic, it would be the Pennsylvania Action that should be stayed, if any,

5   and not the Washington action.

6   **C.  Orderly Course of Justice**

7       The third factor the court considers is the orderly course of justice.  *CMAX, Inc.*,

8   300 F.2d at 268.  Internet Order largely reiterates arguments that the court has already

9   rejected.  *See supra* §§ III.A, III.B.  In addition, however, Internet Order argues that the

10  outcome of the Pennsylvania Action may have collateral estoppel implications with

11  respect to this action.  (Mot. at 8-9.)  Yet, given the more specific nature of the claim

12  under ROSCA, it is unlikely that the outcome of the Pennsylvania Action would affect

13  the outcome of this claim.  Further, it is unlikely that any decision in the Pennsylvania

14  Action concerning the CPL would bear upon the State's claim under the UGA as a

15  predicate for one of its CPA claims.  Thus, the court concludes that concerns about the

16  orderly course of justice do not weigh in favor of a stay.

17  **D.  Alternative Action**

18      In the alternative, Internet Order requests that the court enter a Scheduling Order

19  in coordination with the Pennsylvania Action.  (Mot. at 9.)  There is no scheduling order

20  in that action to date and therefore there is nothing that can presently be "coordinated."

21  Once a scheduling order is in place in both actions, if discovery in this action can be

22  coordinated with discovery in the Pennsylvania Action in a manner that will not delay

1   this proceeding, then the court expects the parties to cooperate to accomplish such

2   coordination.  However, the court will not delay this proceeding to accommodate the

3   Pennsylvania Action.

4                        **IV.    CONCLUSION**

5          For the foregoing reasons, the court DENIES Internet Order's motion for a stay or,

6   in the alternative, to establish a coordinated case schedule with a related case.

7          Dated this 2nd day of March, 2015.

8

9

10   _____

     JAMES L. ROBART

11   United States District Judge

12

13

14

15

16

17

18

19

20

21

22


ORDER- 15